**Opinion issued August 9, 2016**



In The

# Court of Appeals

For The

# First District of Texas

————————————

## NO. 01-15-00900-CV

————————————

**NATIONAL CHURCH RESIDENCES OF ALIEF, TX, Appellant**

**V.**

**HARRIS COUNTY APPRAISAL DISTRICT, Appellee**

---

**On Appeal from the 269th District Court**
**Harris County, Texas**
**Trial Court Case No. 2014-35858**

---

## O P I N I O N

National Church Residences of Alief, TX ("NCR") owns an apartment complex providing federally-subsidized housing to low-income senior citizens. For tax years 2012 and 2013, NCR requested that it be exempt, as a charitable organization under Texas Tax Code Section 11.18(d), from paying ad valorem

taxes. NCR asserted that it was entitled to the exemption because it provided permanent housing and related support services to the elderly residents of its property without regard to the residents' ability to pay for the housing or the other services.

The Harris County Appraisal District ("HCAD") denied the requested exemption on the basis that NCR was not providing housing or services without regard to the residents' ability to pay. NCR filed suit, seeking judicial review of the denial. After the parties filed cross-motions for summary judgment, the trial court granted HCAD's motion and denied that of NCR. On appeal, NCR raises one issue, asserting that trial court erred in ruling on the motions for summary judgment. NCR maintains that it was entitled to a property tax exemption under Tax Code Section 11.18(d) for tax years 2012 and 2013.

We reverse and remand.

**Background**

NCR is an Ohio nonprofit corporation, organized exclusively for charitable and educational purposes; it is exempt from federal income taxation pursuant to Section 501(c)(3) of the Internal Revenue Code. NCR's articles of incorporation provide that it "shall have the power to provide elderly persons and handicapped persons with housing facilities and services specially designed to meet their

2

physical, social, and psychological needs, and to promote their health, security, happiness, and usefulness in longer living" on a nonprofit basis.

Since 1995, NCR has owned a 62-unit apartment complex in Houston, known as the Evening Star Villa ("the Property"). In 1995, NCR obtained financing from the Department of Housing and Urban Development ("HUD") to develop the Property into low-income rental housing for either elderly or disabled persons. In conjunction with the financing, NCR entered into a Project Rental Assistance Contract with HUD. The contract indicated that NCR agreed to provide housing for low-income elderly persons at the Property, and HUD agreed to provide monthly subsidies to NCR "[to] cover the difference between [NCR's] Operating Expenses and tenant payments as determined in accordance with the HUD-established schedules and criteria." In other words, pursuant to the agreement, a tenant would pay a portion of the monthly rent, calculated under HUD's formulas depending on the tenant's income, and HUD would pay the remaining portion of the rent to NCR as a subsidy.

In return for receiving HUD's financial assistance, NCR was required to comply with various federal statutory and regulatory requirements regarding the management of the Property. HUD regulations also governed the application process for renting an apartment, establishing who was eligible to be a tenant at the

3

Property. NCR summarized many of the eligibility requirements in its published "Tenant Selection Plan."

As stated in the Tenant Selection Plan, to be eligible for tenancy, a person must be at least 62 years old, and the person's annual income cannot exceed certain income limits. A prospective tenant must also "[p]rove the ability to fulfill all lease requirements (with or without assistance)" and must "[a]gree to pay the rent required by the program . . . ." A tenant is further required "to pay the full security deposit at move-in." A tenant must pay a security deposit equal to the tenant's portion of the monthly rent or $50, whichever is greater. The tenant must pay the security deposit from a tenant's "own resources and any other public or private resources."

NCR also had a published eviction policy, providing that, if a tenant fails to pay his non-subsidized portion of the rent by the third day of the month, the tenant will receive a 10-day notice. If the rent balance is still owed after the thirteenth day of the month, a three-day notice to vacate "will be issued to evict."

In addition to housing, residents of the Property have health, social, and educational services available to them. Some, but not all, of the services are provided through a federally-funded service coordination program and are staffed by a federally funded service coordinator.

4

Beginning in 1997, NCR received an exemption from paying ad valorem taxes on the Property. On October 29, 2012, HCAD sent a letter to NCR, requesting NCR "to file a new application to confirm current qualification for the exemption." NCR filed an "Application for Charitable Organization Property Tax Exemption." With regard to its function, NCR checked the box on the form that stated, "Provides permanent housing and related social, health care and educational facilities for persons 62 years of age or older without regard to ability to pay." When asked to describe the use of the Property, NCR responded, "This property is used to provide housing for low income elderly without regard to ability to pay."

HCAD denied NCR's property-tax-exemption request for tax years 2012 and 2013. HCAD took the position that NCR was not providing its residents with housing or other services without regard to the residents' ability to pay. For that reason, HCAD asserted that NCR was not entitled to a property tax exemption under Tax Code Section 11.18(d), as implied by NCR's s application.

NCR filed suit in district court, seeking judicial review of HCAD's denial of its request for a property-tax exemption by claiming that it was an entitled to an exemption under the Texas Tax Code. HCAD filed a motion for summary judgment regarding NCR's claim. HCAD asserted that NCR did not provide housing to its elderly residents without regard to their ability to pay, as required to receive the tax exemption.

In support of its motion, HCAD offered NCR's Tenant Selection Plan, which indicated that tenants must pay a security deposit at move-in, and tenants must agree to pay the rent required by the program under which they are receiving assistance. HCAD also pointed to NCR's eviction policy, which provided the procedure by which a tenant would be evicted for non-payment of rent.

In addition to filing a response to HCAD's motion, NCR filed a cross-motion for summary judgment. NCR claimed that, as a charitable organization, it was entitled to a property-tax exemption under Tax Code Section 11.18(d)(3) because it was "providing support without regard to the beneficiaries' ability to pay to . . . elderly persons." TEX. TAX CODE ANN. § 11.18(d)(3) (Vernon 2015). NCR also claimed that it was entitled to an exemption under Section 11.18(d)(13) because it was "providing permanent housing and related social, health care, and educational facilities for persons who are 62 years of age or older without regard to the residents' ability to pay." *Id.* § 11.18(d)(13).

Included in NCR's summary-judgment evidence were the affidavits of its president and vice president, certain of its business and financial records, and documents detailing HUD regulations and requirements relevant to the Property's management and occupancy, such as the HUD Policy Handbook. In the summary-judgment proceedings, NCR pointed out that the tenancy application process and the rental criteria are regulated by HUD. NCR acknowledged that prospective

6

tenants must agree to pay the rent required by the program providing assistance, and tenants must pay a security deposit before moving into to NCR's property. NCR asserted, however, that these requirements did not show that it provided housing and services to its elderly residents based on the residents' ability to pay. Rather, NCR pointed out that these are HUD requirements, and that NCR must follow these requirements before it can permit a resident to rent an apartment.

NCR asserted that it treats all rental applicants the same, regardless of their ability to pay. NCR offered evidence showing that, although the market value of each apartment is $389, no resident pays the full $389 out of his or her own funds. Instead, the amount that each resident pays is determined by a HUD formula. Pursuant to the formula, the amount of rent each tenant must pay is the highest of (1) 30% of the person's adjustment monthly income; (2) 10% of the person's monthly income; or (3) the portion of welfare payments specifically designated for housing costs. NCR's president, Steve Bodkin, explained in his affidavit as follows:

> [W]hile the market rate for all units at the Evening Star property was $389.00 per month in 2012, no tenants actually paid the market rate to rent a unit. Subsidies from the federal government are paid to NCR to cover the difference between the market rent and rent charged to each tenant.

NCR also offered a list indicating, as of October 12, 2012, what each resident had paid in monthly rent and what HUD paid each month for each

apartment. The list showed that, adding the amount paid by each tenant and by HUD, NCR received the market rate of $389 per month for each apartment. The list indicated that most of the tenants paid between $100 and $200 per month in rent with HUD paying the remainder of the $389. A few of the residents were responsible for payments as low as $13 per month in rent. In those cases, the remaining $376 was paid to NCR by HUD.

NCR further offered evidence showing that it had a corporate policy "to maintain in residence any senior citizen resident who becomes unable to pay the regular charges if, after investigation, the Board of Trustees determines that said resident is without financial ability to pay." Relatedly, NCR's vice president, Steven A. Van Camp, testified in his affidavit as follows:

> If a resident cannot pay his or her rent in a timely manner, NCR staff (including a federally funded service coordinator) will assist the resident in obtaining additional assistance. The assistance can be obtained through governmental agencies or non-profit organizations such as churches. If assistance cannot be obtained, NCR staff will work with the resident to formulate a reasonable payment plan. NCR does not and did not in 2012 or in 2013 charge any residents late fees if rent payments were late. Likewise, NCR did not evict any residents in 2012 or in 2013 for non-payment of rent.

NCR also pointed out that it offered support to its residents in the form of numerous services, for no additional charge. Van Camp stated,

> [These] services include, without limitation, a service coordination program, a library, an on-site laundry facility and elevator, an emergency call system, and a community game room. Through the service coordination program, residents at NCR can get financial and

8

medical assistance, educational and emotional support, homemaker assistance, and assistance with legal issues. Also available to residents is a Specialized Telecommunication Assistance Program to assist residents with hearing and sign problems, a Prescription Drug Delivery Pharmacy Program, hearing tests and hearing aids, blood pressure readings, diabetic testing, flu and shingle shots, foot specialist programs, and transportation services.

NCR averred that it provided these services to all of its residents without regard to the ability to pay. NCR asserted that the services would be provided even if a resident failed to pay rent.

In his affidavit, Bodkin also stated,

NCR also provides its tenants with an allowance to assist in meeting their electric utility obligations. If, in any given month, the allowance is more than the amount charged to a tenant for rent and electricity actually used, which occasionally happens, NCR tenders payment to the tenant for the difference that month. In other words, during some months, some NCR residents are actually paid to live in an air conditioned unit and take advantage of the free services that NCR has to offer to its residents.

Ultimately, the trial court granted HCAD's motion for summary judgment, and denied that of NCR. This appeal followed in which NCR raises one issue. Contending that it is entitled to a property-tax exemption under Tax Code Sections 11.18(d)(3) and (13), NCR challenges the summary judgment rendered in HCAD's favor.

9

## Summary Judgment

### A.     Standard of Review & Rules of Construction

A party moving for traditional summary judgment has the burden to prove that there is no genuine issue of material fact and that it is entitled to judgment as a matter of law. TEX. R. CIV. P. 166a(c); *SeaBright Ins. Co. v. Lopez,* 465 S.W.3d 637, 641 (Tex. 2015). When a plaintiff moves for summary judgment on its claim, it must establish its right to summary judgment by conclusively proving all the elements of its cause of action as a matter of law. *Rhone Poulenc, Inc. v. Steel,* 997 S.W.2d 217, 223 (Tex. 1999); *Anglo–Dutch Petroleum Int'l, Inc. v. Haskell,* 193 S.W.3d 87, 95 (Tex. App.—Houston [1st Dist.] 2006, pet. denied). A matter is conclusively established if reasonable people could not differ as to the conclusion to be drawn from the evidence. *See City of Keller v. Wilson,* 168 S.W.3d 802, 823 (Tex. 2005). Conversely, a defendant is entitled to summary judgment if it disproves at least one element of the plaintiff's cause of action as a matter of law. *Doe v. Boys Clubs of Greater Dall., Inc.,* 907 S.W.2d 472, 476–77 (Tex. 1995).

If a summary-judgment movant meets its burden, the burden then shifts to the nonmovant to raise a genuine issue of material fact precluding summary judgment. *See Centeq Realty, Inc. v. Siegler,* 899 S.W.2d 195, 197 (Tex. 1995); *Goodyear Tire & Rubber Co. v. Mayes,* 236 S.W.3d 754, 755 (Tex. 2007) (stating that summary-judgment evidence raises fact issue if reasonable and fair-minded

10

jurors could differ in their conclusions in light of all evidence presented). We review summary-judgment evidence in the light most favorable to the party against whom the summary judgment was rendered, crediting evidence favorable to that party if reasonable jurors could, and disregarding contrary evidence unless reasonable jurors could not. *SeaBright Ins. Co.*, 465 S.W.3d at 641.

When, as here, both sides move for summary judgment, and the trial court grants one motion and denies the other, we review the summary-judgment evidence presented by both sides, determine all questions presented, and render the judgment the trial court should have rendered. *Id.* at 641–42. We may consider evidence presented by both parties in determining whether to grant either motion. *Expro Americas LLC v. Sanguine Gas Exploration, LLC*, 351 S.W.3d 915, 919 (Tex. App.–Houston [14th Dist.] 2011, pet. denied) (citing *Knighton v. Int'l Bus. Machs. Corp.*, 856 S.W.2d 206, 208–09 (Tex. App.—Houston [1st Dist.] 1993, writ denied); *River Oaks Shopping Ctr. v. Pagan*, 712 S.W.2d 190, 193 (Tex. App.—Houston [14th Dist.] 1986, writ ref'd n.r.e.)).

"When both parties move for summary judgment, each party must carry its own burden, and neither can prevail because of the failure of the other to discharge its burden." *BP Auto., L.P. v. RML Waxahachie Dodge, L.L.C.*, 448 S.W.3d 562, 569 (Tex. App.—Houston [1st Dist.] 2014, no pet.) (citing *Guynes v. Galveston Cty.*, 861 S.W.2d 861, 862 (Tex. 1993)). We first review the order granting

11

summary judgment and if we determine the order was erroneous, we review the trial court's action in overruling the denied motion. *Id.* (citing *Lambrecht & Assoc., Inc. v. State Farm Lloyds*, 119 S.W.3d 16, 20 (Tex. App.—Tyler 2003, no pet.)).

At issue in the summary-judgment proceedings was whether NCR was entitled to a property-tax exemption under Tax Code Section 11.18(d). Issues involving statutory construction are questions of law, which we review de novo. *See Railroad Comm'n v. Tex. Citizens for a Safe Future & Clean Water*, 336 S.W.3d 619, 624 (Tex. 2011). When construing a statute, "the primary objective is to give effect to the Legislature's intent as expressed in the statute's language." *Galbraith Eng'g Consultants, Inc. v. Pochucha*, 290 S.W.3d 863, 867 (Tex. 2009). Words that are not defined are given their ordinary meaning unless a different meaning "is apparent from the context" or unless the ordinary meaning "leads to absurd results." *Marks v. St. Luke's Episcopal Hosp.*, 319 S.W.3d 658, 663 (Tex. 2010); *see also Galbraith*, 290 S.W.3d at 867 (stating that if "the words of a statute are clear and unambiguous, we apply them according to their plain and common meaning"). Courts "generally avoid construing individual provisions of a statute in isolation from the statute as a whole." *Tex. Citizens*, 336 S.W.3d at 628.

"Taxing statutes are construed strictly against the taxing authority and liberally for the taxpayer." *Morris v. Hous. Indep. Sch. Dist.*, 388 S.W.3d 310, 313

12

(Tex. 2012). In contrast, tax exemptions are strictly construed against the claimant. *See Bullock v. Nat'l Bancshares Corp.*, 584 S.W.2d 268, 271–72 (Tex. 1979). The claimant seeking an exemption "bears the burden of 'clearly showing' that it falls within the statutory exemption." *Tex. Student Hous. Auth. v. Brazos Cty. Appraisal Dist.*, 460 S.W.3d 137, 140–41 (Tex. 2015) (quoting *North Alamo Water Supply Corp. v. Willacy Cty. Appraisal Dist.*, 804 S.W.2d 894, 899 (Tex. 1991)).

## B. Analysis: HCAD's Motion for Summary Judgment

NCR claims it is exempt from paying ad valorem taxes for tax years 2012 and 2013 pursuant to Texas Constitution Article 8, Section 2(a) and Tax Code Subsections 11.18(d)(3) and (13). *See* TEX. CONST. art. VIII, § 2(a); TEX. TAX CODE ANN. § 11.18(d)(3), (13). Subsections 11.18(d)(3) and (13) provide as follows:

> (d) A charitable organization must be organized exclusively to perform religious, charitable, scientific, literary, or educational purposes and, except as permitted by Subsections (h) and (l), engage exclusively in performing one or more of the following charitable functions:
>
> . . . .
>
> > (3) providing support without regard to the beneficiaries' ability to pay to:
> >
> > > (A) elderly persons, including the provision of:
> > >
> > > > (i) recreational or social activities; and

13

> (ii) facilities designed to address the special needs of elderly persons;
>
> . . . .
>
> (13) providing permanent housing and related social, health care, and educational facilities for persons who are 62 years of age or older without regard to the residents' ability to pay[.]

TEX. TAX CODE ANN. § 11.18(d)(3), (13). The dispositive issue in this appeal is whether, for tax years 2012 and 2013, NCR provided housing and related services to its residents without regard to the residents' ability to pay.

In its motion for summary judgment, HCAD asserted, "[NCR's] own documents expressly state that . . . a security deposit is required in order to be eligible for housing." HCAD claimed, "This conclusively negates the requirement that housing be provided 'without regard to the beneficiaries' ability to pay.'" HCAD offered NCR's published Tenant Selection Policy in support of its motion. The policy provides, "An application may be denied for any of the following reasons: . . . The applicant cannot pay the appropriate security deposit at move-in."

The Tenant Selection Policy further provides,

> The applicant is required to pay the full security deposit at move-in. Security deposits are kept in an interest bearing account. Interest is paid or refunded in accordance with any state or local law. The security deposit is refundable barring any damage to the unit. The tenant forfeits the security deposit if they fail to give 30 day notice of move-out.

14

The amount of the security deposit that each resident must pay is determined by federal regulation.  Pursuant to the regulation, each resident must pay a security deposit equal to the amount of the resident's monthly rent or $50, whichever is greater."  The resident list indicated that each of NCR's residents had paid a security deposit of $50 or more as of October 12, 2012.

NCR takes the position that collection of a security deposit from its residents does not conclusively establish, as a matter of law, that it did not provide housing without regard to the residents' ability to pay, as required to receive the tax exemption.  We agree with NCR.

The HUD Policy Handbook, containing the policies and regulations applicable to NCR's property, addressed the topic of security deposits.  The handbook provided that "[t]he tenant is expected to pay the security deposit from his/her own resources, and/or other public or private sources."  It stated that "the security deposit is refundable" and, like the Tenant Selection Plan, required security deposits to be kept in separate, interest bearing accounts until refunded to the resident.  The HUD Policy Handbook explained that "[s]ecurity deposits provide owners with some financial protection when a tenant moves out of the unit and fails to fulfill his/her obligations under the lease."

When read in the context of the governing HUD provisions, the security-deposit requirement is not an indicator of whether NCR failed to provide housing

15

services without regard to its residents' ability to pay. As the context shows, a resident's *ability* to pay the deposit is not the focus of the security-deposit requirement. HUD's handbook provides that the one-time deposit may be paid by the resident or by a public or a private source. The handbook makes clear that the significance of the security deposit is to protect the landlord from any costs, resulting from a tenant's breach of the lease. The security deposit remains in a separate interest-bearing account until the tenancy ends. Should the resident comply with the lease, the security deposit is then refunded to the resident along with accrued interest. In short, the evidence, taken together, indicates that the security deposit is a one-time administrative charge that has little bearing on whether NCR provides housing without regard to the residents' ability to pay.

We further note that, under HUD's rules, the amount of the deposit correlates to the resident's income, indicating that HUD sets the amount of the deposit at an amount that low-income persons have the ability to pay. Although the Tenant Selection Plan states that a prospective tenant *may* be rejected if the tenant cannot pay a security deposit at move-in, HCAD offered no evidence to show that NCR had rejected a prospective resident based on an inability to pay the security deposit. There was also no evidence that the payment of a security deposit posed an obstacle to low-income persons being accepted as residents at the Property, as demonstrated by the low income status of the residents, some of whom

16

paid as little as $13 per month in rent. *See City of McAllen v. Evangelical Lutheran Good Samaritan Soc'y*, 530 S.W.2d 806, 811 (Tex. 1975) (holding that nursing home was entitled to property-tax exemption as a "purely public charity" under predecessor statute, which required, to be a purely public charity, the facility had to provide its benefits "without regard to poverty or riches of the recipient," even though nursing home's admission procedure required "each prospective patient to obtain the signature of a 'responsible party' as part of the admission agreement"; court held such requirement did not pose an "impermissible obstacle to the admission of charity patients" "as seen by the high ratio of welfare patients" in the facility). On this record, we conclude that HCAD failed to show that requiring payment of a security deposit conclusively establishes that NCR does not provide housing without regard to its residents' ability to pay.

As a second ground for summary judgment, HCAD asserted that NCR's Tenant Selection Plan also "conclusively demonstrates that [NCR] does not provide housing 'without regard to the beneficiaries' ability to pay' because the plan provides that "[a]n applicant must agree to pay the rent required by the program under which the applicant will receive assistance." In response, NCR correctly asserts that courts have held charitable organizations were entitled to a property-tax exemption, even though the organization charged and received payment for its services. *See, e.g., id.* at 808–09 (holding that organization

17

charging for nursing-home services was entitled to property tax exemption because "[t]he evidence in the record that no one has ever been denied admission nor discharged [from the nursing home] because of inability to pay is uncontradicted"); *NHH-Canal St. Apts., Inc. v. Harris Cty. Appraisal Dist.*, 2015 WL 7306541, at \*4 (Tex. App.—Houston [14th Dist.] Nov. 19, 2015, no pet.) (substitute mem. op.) (holding that NHH-Canal Street, which operated a low-income housing complex, was entitled to property-tax exemption under Section 11.18(d)(2), even though it charged rent and had screening requirement that tenants have incomes greater than 1.5 times rental amount). As recognized by one court, "An organization which provides housing, support or medical care for the elderly and infirm is not to be denied tax exemption merely because some, or even a majority, of its patients are able to pay for their own care." *Dall. Cty. Appraisal Dist. v. The Leaves, Inc.*, 742 S.W.2d 424, 427 (Tex. App.—Dallas 1987, writ denied).

In its motion, HCAD also pointed out that NCR has an eviction policy that "relates directly to a tenant's ability to pay." HCAD asserted that the eviction policy showed that NCR had "affirmatively consider[ed] the ability to pay before accepting a tenant." NCR acknowledged that it had an eviction policy; however, it asserted that it did not enforce the policy. To counter HCAD's argument, NCR pointed to a corporate resolution that had been passed by its board of trustees in 1996. The resolution provided,

18

[NCR] has a long-standing corporate policy to maintain in residence any senior citizen resident who becomes unable to pay the regular charges if, after investigation, the Board of Trustees determines that said resident is without financial ability to pay.

This policy is limited only by financial constraints on the corporation. Financial assistance may be accomplished by: applying National Church Residences or the subsidiary's own resources; seeking funds from local and federal welfare units; soliciting funds from other organizations . . . .

NCR also cited the following affidavit testimony of Vice President Van Camp: "If a resident cannot pay his or her rent in a timely manner, NCR staff . . . will assist the resident in obtaining additional assistance." He explained that "[t]he assistance can be obtained through governmental agencies or non-profit organizations such as churches." He further stated that, "[i]f assistance cannot be obtained, NCR staff will work with the resident to formulate a reasonable payment plan." Van Camp testified that "NCR did not evict any residents in 2012 or in 2013 for non-payment of rent." In light of this evidence, we agree with NCR that its eviction policy did not conclusively establish that NCR considered its residents' ability to pay when deciding whether to admit or to retain a resident.

We conclude that HCAD did not show as a matter of law that NCR provided housing and related services to its residents based on the residents' ability to pay. We hold that the trial court erred when it granted HCAD's motion for summary judgment.

19

## C. Analysis: NCR's Motion for Summary Judgment

Next, we determine whether NCR met its summary-judgment burden to establish that it was entitled to its tax-exemption claim for tax years 2012 and 2013. To meet this burden, NCR had to conclusively establish that it provided housing and related services to its residents without regard to the residents' ability to pay for those services.

In its motion for summary judgment, NCR asserted that the phrase "without regard to the beneficiaries' ability to pay" does not preclude all consideration of a beneficiary's ability to pay; rather, it means that an organization seeking a tax exemption cannot "discriminate" against those who are not able to pay.[1] To support its assertion, NCR relied on *City of McAllen v. Evangelical Lutheran Good Samaritan Society*, 530 S.W.2d 806 (Tex. 1975). There, the Supreme Court of Texas determined that a non-profit organization, Evangelical Lutheran Good

---

[1] In its motion for summary judgment, NCR also asserted that its consideration of its residents' ability to pay should not preclude it from receiving a tax exemption to that extent that HUD regulations require it to consider a prospective resident's ability to pay. However, Tax Code Sections 11.18(d)(3) and (13) make no exceptions for a charitable organization to receive a tax exemption on the basis that the organization must consider the beneficiaries' ability to pay in order to comply with governmental regulations. NCR's "interpretation would have us judicially amend the statute to add an exception not implicitly contained in the language of the statute." *Fitzgerald v. Advanced Spine Fixation Sys., Inc.*, 996 S.W.2d 864, 867 (Tex. 1999). We note that "[w]e may add words into a statutory provision only when necessary to give effect to clear legislative intent. Only truly extraordinary circumstances showing unmistakable legislative intent should divert us from enforcing the statute as written." *Id.* NCR has not shown such legislative intent here.

Samaritan Society ("the Society"), was entitled to a property-tax exemption as a "purely public charity" under now-repealed Section 7 of Texas Revised Civil Statute article 7150. *Id*. at 808. Section 7 required that, to be a purely public charity, an organization had to provide its benefits "without regard to poverty or riches of the recipient."[2] *See N. Alamo Water Supply*, 804 S.W.2d at 897 (discussing content and previous court interpretations of article 7150).

In its analysis, the *City of McAllen* court found it noteworthy that the Society had "established a policy to the effect that '*no person who applies for treatment or care is denied admission* or once admitted is discharged because of poverty or riches, creed, station or color.'" *City of McAllen*, 530 S.W.2d at 809 (emphasis added). The court explained, however, that "a mere charter declaration of a worthwhile purpose will not make an institution one of purely public charity if it is not one in fact." *Id.* In other words, the Society needed to show that it was actually putting its stated policy into practice. *See id.* Relevant to this determination, the *City of McAllen* court noted that "[e]vidence presented at the trial reflected that although some compensation is received from all patients, either directly from paying patients or indirectly through welfare assistance, some 10 percent of the patients at the [] facility fail to pay the cost of their care." *Id.* In

---

[2]     Section 7 of Texas Revised Civil Statute article 7150 has been recognized as a predecessor statute to Tax Code Section 11.18(d). *See N. Alamo Water Supply Corp. v. Willacy Cty. Appraisal Dist*., 804 S.W.2d 894, 897 (Tex. 1991).

other words, the Society, as a charity, bore the cost of the services it provided for 10 percent of its residents. Based on the evidence that the Society provided services to those for which it never received any form of payment, the court determined that the Society had put its policy into practice because "[t]he evidence in the record that no one has ever been denied admission nor discharged because of inability to pay is uncontradicted." *Id.*; *see also The Leaves*, 742 S.W.2d at 430 (upholding trial court's determination that owner of nursing home was entitled to exemption under Section 11.18(d) when evidence showed, inter alia, that facility did not "turn away patients who cannot pay").

NCR asserts that the evidence it offered to support summary judgment in this case is analogous to that offered to support the tax exemption in *City of McAllen*. We disagree. The type of evidence offered in *City of McAllen* is not present in the instant summary-judgment record.

In *City of McAllen*, the evidence established that, although 10 percent of the nursing home residents never paid for the services provided to them, the Society nonetheless provided services to those non-paying residents. *See City of McAllen*, 530 S.W.2d at 809. Here, although Van Camp testified that no resident was evicted for nonpayment of rent, that testimony was significant only if a resident had actually failed to pay rent. Unlike in *City of McAllen*, NCR did not show that any resident had failed to pay rent and had nonetheless been permitted to remain at

the Property during the subject tax years.[3]  Thus, even if we were to accept NCR's general assertion that the phrase "without regard to the beneficiaries ability to pay" means simply that an organization seeking a tax exemption cannot discriminate against those unable to pay, NCR did not establish its entitlement to summary judgment because it did not show that any resident was unable to pay the rent; that is, NCR did not show that it provided housing to a resident even though the resident did not pay, as was shown in *City of McAllen*.

As another basis for summary judgment, NCR asserts that an analysis of its "total operations" show that it provided housing and related services to its residents without regard to their ability to pay.  To support its "total operations" argument, NCR relies on the following language from *NHH-Canal Street Apartments*:

> We hold the "ultimate consideration" should turn on the totality of the services NHH-Canal Street provided at or below cost, or in the case of programs and services, at no cost. . . .  The *City of McAllen* court's rationale is instructive and controls the outcome here.  Key to that holding is not that services were provided free of charge or that certain patients contributed toward the cost of their care and certain patients paid little or nothing. *See City of McAllen*, 530 S.W.2d at 809–10.  Rather, the "ultimate consideration" is based on an evaluation of the total operation and whether the charitable

---

[3]  At oral argument, NCR pointed out that the resident list, dated October 12, 2012, indicated that a number of residents had negative account balances, ranging from a negative balance of $1.00 to $37.00.  However, no other evidence was offered to explain the origin of the negative balances; nor was it apparent how long each negative balance had been pending.  In other words, it is not clear whether the negative balances corresponded to a failure to pay rent or to some other fee or charge.

23

organization demonstrated that beneficiaries were not required to pay the full cost of services received. *Id.*

*NHH-Canal St. Apts.*, 2015 WL 7306541, at *4

In *NHH-Canal Street Apartments*, the evidence had shown that NHH-Canal Street provided housing and "other support, including assistance with securing employment, managing finances, education assistance, social programs, nutritional information, health screenings and counseling" to its residents. *Id.* at *1. With regard to its operations, the evidence had shown as follows:

> The rent levels are substantially below-market rental rates due to large contributions which eliminated debt for the construction and operation of the apartments. The rents do not fund all of the resident services provided at NHH–Canal. As a result, NHH-Canal operates at a loss on an annual basis. Additionally, because the rents do not cover the total cost of operating expenses (rent and other services provided), New Hope Housing [NHH–Canal's parent company] subsidizes the operations at NHH–Canal Street. Finally, the evidence reflects that NHH–Canal Street was constructed entirely through charitable contributions, rendering the operation debt-free. When taken as a whole (below-market rent, costs of resident services programs and debt-free construction), for the tax years at issue, 65–75% of NHH-Canal Street's costs are charitable.

*Id.* at *3. After evaluating NHH-Canal's total operations, the court held "the evidence conclusively established that NHH–Canal Street is a charitable organization which engages exclusively in serving the 'impoverished' without regard to their ability to pay, and it should not be denied the tax exemption of Section 11.18(d)(2)." *Id.* at *4.

24

Here, NCR argues that an evaluation of its total operations shows that it serves its residents without regard to their ability to pay because its residents do not pay the full cost of the housing or supportive services provided. NCR emphasizes that all of its residents pay less than market rent; instead, each resident pays the non-subsidized portion of the market rent as determined by a HUD formula.

The evidence showed that market rent for NCR's apartments is $389. Based on the HUD formula, some tenants paid as little as $13 per month with most residents paying between $100 and $200 per month. HUD paid NCR the difference between what the tenant paid and the market rent of $389. In other words, between the resident's payment and HUD's payment, NCR received the full monthly market rent of $389, unless a resident failed to pay. Here, NCR points to no evidence that, during tax years 2012 and 2013, it was not receiving the full $389 market rent each month for each apartment; that is, it points to no evidence that its residents were not paying their portion of the market rent. To the contrary, the list offered by NCR—showing what each resident paid in monthly rent and what HUD paid for each apartment—indicated that NCR was paid the market rent of $389 for its apartments as of October 12, 2012.

Additionally, in *NHH-Canal Street Apartments* the evidence showed that, considering its total operations, NHH-Canal Street did not receive sufficient funds

from its residents to cover the cost of the housing provided; rather, 65–75% of NHH–Canal Street's costs were paid for by its parent company or through charitable contributions to the organization. *See id.* at \*4; *see also City of McAllen*, 530 S.W.2d at 808 (recognizing as significant evidence that the Society did not receive sufficient funds from its residents, including the resident's welfare payments, to cover all costs of services provided); *Dall. Cnty. Appraisal Dist.*, 742 S.W.2d at 427 (granting exemption when 14%, or $135,000, of facility's revenue was derived from charitable contributions to cover shortfall of payments made by residents). Here, in contrast, the evidence did not establish that NCR covered any portion of the cost of providing services to its residents for tax years 2012 and 2013 with charitable funds rather than with funds derived from rental payments received either directly from individual residents or from HUD subsidies. We recognize that NCR offered financial and auditing records for the Property in support of its motion for summary judgment; however, the records are less than clear with respect to the issue of its total operations, and NCR offered no assistance in interpreting the records for purposes of this analysis.

We further note that NCR offered affidavit evidence indicating that it "provides its tenants with an allowance to assist in meeting their electric utility obligations." However, NCR offered no evidence regarding whether it provided

26

such assistance specifically during tax years 2012 and 2013 or regarding any of the particulars of any allowances that it had given.

NCR also offered evidence indicating that various medical, social, and educational services were available, without charge, to its residents. However, in contrast to the evidence in *NHH-Canal Street Apartments*, there was no evidence here establishing that the cost of these services was borne by NCR during the relevant tax years. *See NHH-Canal St. Apts.*, 2015 WL 7306541, at *4. In fact, it appears that a number of the services listed by NCR were part of the federally-funded service coordination program available at the Property.

In short, after considering the totality of NCR's operations, the evidence was not sufficient to show, as it had in *NHH-Canal Street Apartments*, what portion, if any, of the costs of the housing or the supportive services were charitable. Thus, the evidence regarding the totality of NCR's operations failed to conclusively show as a matter of law that NCR provided permanent housing or other support to its residents without regard to the residents' ability to pay.

We conclude that NCR did not conclusively establish its right to a property tax exemption under Tax Code section 11.18(d). We hold that the trial court did not err when it denied NCR's motion for summary judgment.

We sustain NCR's sole issue to the extent that it challenged the trial court's granting of HCAD's motion for summary judgment, but we overrule NCR's issue

to the extent that it asserts the trial court erred by denying its own motion for summary judgment.

## Conclusion

We reverse the judgment of the trial court and remand for further proceedings.


Laura Carter Higley
Justice

Panel consists of Justices Higley, Bland, and Massengale.